D. W. BATES, Superintendent of Banking, Receiver, Appellee, v. ALICE B. CARTER et al., Appellants.

No. 43729.

FEBRUARY 9, 1937.

Richard C. Leggett, for appellant.

Roscoe P. Thoma, for appellee.

SAGER, J.—By reason of the fact that this case comes up on the ruling on the demurrer these facts are admitted:

Appellant claims the cattle in question under an assignment from her husband. This assignment was taken with full knowledge on her part that, at the time the same was made, her husband, Harley, was owing the bank something on the cows and that ''they would be hers after her husband had paid for them.''

At the trial, as the last witness for the appellant, Harley Carter testified that he had paid the amount due under the contract, and exhibited his copy of the contract which bore upon it a ''PAID'' stamp of the bank. This he claims was placed upon the contract at the time he paid the money to Ricksher, the president of the bank. At the time this evidence was brought forward, appellee claims that it was thought that the stamp was, in fact, genuine, but that it had been surreptitiously procured and placed thereon by Carter. The claim of Carter to the contrary

naturally came as a surprise and appellee was not able to meet it. Ricksher positively denied that any such payment had been made. Under the conviction that there was something wrong with Carter's claim, appellee caused an investigation to be made, which resulted in the discovery of the facts which will in part be set out and which appellee claims could not have been discovered in time to meet the testimony at the trial, but which, if they had been produced, would have probably resulted in a different verdict and judgment.

Upon application made to the trial court appellee was authorized to submit to an examiner of questioned documents of the Northwestern University of Chicago, the instrument bearing the "PAID" stamp introduced by appellant. This examiner, after comparing it with the genuine stamps of the bank, was ready to testify that the stamp upon the exhibit presented by Carter was not the same as the genuine stamps.

With this as a starting point, the investigation disclosed that Carter, on February 21, 1935, had procured from a stamp company in St. Louis, Missouri, the insert die appearing on the stamp submitted as proof of payment at the trial. This is made clear by the testimony of one member of the St. Louis company who said that on February 18, 1935, Carter presented an old note of the Iowa State Savings Bank of Fairfield (now represented by the appellee as superintendent of banking), and explained that he wanted a duplicate of the rubber "PAID" stamp appearing thereon. Carter (who at that time gave his name as Griffin) claimed to have a connection with the bank at Fairfield. He was told that the company did not have the style of type appearing in the word "PAID" but that it would be possible for Carter to get it. The next day Carter appeared and said that he had secured the desired kind of type, and was told by the representative of the company that he might call the next day for the completed die. The next morning, however, Carter advised another representative of the company that he did not need the stamp he had ordered and, the type being redelivered to him, left. Another employee of the St. Louis company referred to, will testify that he was present when Carter introduced himself as "Griffin" and ordered a duplicate of the "PAID" stamp which he claimed he had lost. He corroborates, in substance and in detail, this line of proposed testimony.

It appears that, having recovered the type as stated, and on

February 20, 1935, Carter went to another company (the American Rubber Stamp Company) at St. Louis, with substantially the same tale that had been told by him to the other concern. He was informed this company did not have this sort of type and that he would have to get a match for it at the type founders. Later on the same day he came back and had with him two fonts of type. He then gave directions that a die for the stamp, using the type which he had brought for the words in the insert, be made, and to copy exactly the form and wording of the "PAID" stamp impression upon the old note which he had brought and left with the company. On the 21st of February, 1935, he called at the company's office and received the insert die which had been made to his order, and also received the portion of the old promissory note with the "PAID" stamp thereon which he had left to be used as copy. A representative of the Type Founders Company which made the type said that on the 19th day of February, 1935, Carter (calling himself J. Johnson) had purchased the type above mentioned.

It was an impression of this stamp on the document claimed by the Carters to be evidence of payment which, on comparison with admittedly genuine "PAID" stamps of the bank, was shown not to be genuine; and appellee in his petition offered to prove by the examiner the various indications of the impression which would show its counterfeit character.

Appellee in his petition asserts, and it is admitted by the demurrer, that none of the evidence, and other evidence which might be set out, was known to him at the time the appellant offered the exhibit with the stamp upon it; nor was it known to him that that stamp was wholly counterfeit, a forgery, and fraudulent; that it was used by Carter for the express purpose of deceiving the court, the jury, and the appellee; that appellee could not have anticipated or been prepared to meet it at the time, that it came as a surprise, with no opportunity of meeting it; and that by reason of the means so employed by Carter in the use of what was extrinsic and collateral fraud, he secured an unfair submission of the case; and that the newly discovered evidence was likely to, and probably would, produce a result different from that which had been reached in the trial; that Carter had not, in fact, paid according to the terms of the agreement offered in evidence, but had by his fraud and deception secured a

verdict which could justly have been based only on actual payment, and that the trial.resulted in a miscarriage of justice.

Appellant Alice says that the judgment should not be disturbed or set aside, for the reason that the fraud was intrinsic and not extrinsic or collateral, and that in any event the evidence, even though forged and fabricated, was only impeaching in its nature, and should not be allowed to disturb the verdict and judgment which fixed her title to the property in controversy.

With appellant's contention we are wholly unable to agree.

Our views on this subject have been frequently expressed, and we have only to apply them to the record before us to abundantly justify the action of the trial court. We said, in Guth v. Bell, 153 Iowa 511, 133 N. W. 833, 887, 42 L. R. A. (N. S.) 692, Ann. Cas. 1913E, 142, this:

"We are well aware of the reasonable objection to the prolonging of litigation by the offer to introduce newly discovered evidence, but in the interest of justice we think that in a proper case, and within the limited period of time fixed by the statute, the unsuccessful party ought to be allowed to secure a new trial on a showing that the acts and conduct of the successful party, even after the trial, have been absolutely inconsistent with the truthfulness of his testimony on the trial. The extension of the rule as to admissibility of evidence, so as to include as competent witnesses the parties to the litigation, makes it important that every practicable check be afforded to the procuring of an unjust result by their false testimony."

In an earlier case, Alger v. Merritt, 16 Iowa 121, we said:

"We cannot adopt the theory of the appellant that any of the proposed testimony was impeaching. It appears that the jury relied upon the testimony of the defendant himself. The newly discovered evidence did not relate to his character for truth and veracity. It was not proposed even to show that he had made statements contradicting in terms those made on the trial. But by his witness it was proposed to prove that he had made admissions and had conversations entirely inconsistent with the whole story of his defense, as developed by the testimony. This was strictly original and not impeaching evidence. It related to admissions made by the party to the record, and it is a

misuse of terms to speak of it as impeaching. The fact that he was sworn as a witness cannot change its character. It would have been admissible if he had not been a witness. And we go further and say, that he should hesitate long before applying in all its strictness the rule contended for, that a new trial should not be allowed to give the party an opportunity to introduce impeaching testimony when it is to affect the evidence of the party himself.''

In Dobberstein v. Emmet County, 176 Iowa 96, 103, 155 N. W. 815, 818, Justice Weaver stated, in part:

''If, upon * * * examination, it shall be made to appear that the truth of the essential facts on which the controversy turns is involved in serious doubt, and that the alleged newly discovered evidence is of a character to aid materially in developing the very truth of the matter, the court will grant the rehearing much more readily than where the evidence leaves little room for doubt that the judgment as rendered effectuates substantial justice; and this is done, not because of any reversible error of the trial court in rendering the judgment, but because the court did not have the benefit of material evidence which now seems obtainable and may, on another trial, lead to a different result.''

In the same opinion, Justice Weaver further announced the views of this court in this language:

''On the other hand, it has often been held that newly discovered evidence to successfully contradict a witness upon a material point may be cause for allowing a new trial, and it is no objection to such order that the evidence may incidentally impeach a witness.''

Other cases to the same tenor and effect may be found, but we forbear citing more than a few of them. See Sheridan Bros. v. Dealy, 198 Iowa 877, 200 N. W. 335; Mally v. Mally, 114 Iowa 309, 86 N. W. 262; Murray v. Weber, 92 Iowa 757, 60 N. W. 492; Utseth v. Pratt-Mallory Co., 208 Iowa 1324, at page 1326, 227 N. W. 115.

Appellant places much reliance on Graves v. Graves, 132 Iowa 199, 109 N. W. 707, 10 L. R. A. (N. S.) 216, 10 Ann. Cas. 1104, but this case will be found as announcing the doctrine of

the quoted cases. Moreover, in the Graves case we sustained the trial court in granting a new trial in a proceeding like this, on the ground that the defendant had misled the court by falsely testifying in a divorce case as to the nature and extent of his property.

The other cases cited by appellant are not productive of a view contrary to that herein expressed. If it is not fraud extrinsic and collateral to the proceedings which resulted in the judgment complained of, to secure such judgment by the use of forged, fraudulent, and fabricated evidence, we do not know how to define it. It is admitted that this evidence was offered in the last stages of the trial, and that which appellee proposes to present to meet it on a new trial would probably result in a different conclusion than was attained in the original trial.

We think the ruling of the trial court on the motion to vacate the judgment was right, and it is affirmed.—Affirmed.

RICHARDS, C. J., and DONEGAN, MITCHELL, PARSONS, KINTZINGER, ANDERSON, and HAMILTON, JJ., concur.